IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PASTEEN PARKS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. H-06-4039 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal are Plaintiff's Motion for Summary Judgment (Instrument No. 13), and Defendant's Motion for Summary Judgment (Instrument No. 14). Having considered the motions, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is DENIED, Plaintiff's Motion for Summary Judgment is GRANTED, and that the decision of the Commissioner be REMANDED for further proceedings.

**I.      Introduction**

Plaintiff Pasteen Parks ("Parks") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405 (g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits (DIB), supplemental security income benefits (SSI), and widow's

1

insurance benefits under the Social Security Act.  Parks argues that the Administrative Law Judge's ("ALJ") decision is flawed because: (1) it is not supported by substantial evidence; and (2) it contains errors of law.  In contrast, the Commissioner contends that there is substantial evidence in the record to support the ALJ's decision and that the decision comports with applicable law and should thus be affirmed.  Namely, the Commissioner asserts that the ALJ properly determined that Parks retained the ability to perform her past relevant work as a telephone operator, that Parks' subjective complaints of severe limitation were not credible to the extent alleged and did not preclude her from performing light work that did not entail repetitive or constant use of her hands for fine motor activities, and that these abilities were not preluded by her functional capacity, so she was therefore not disabled within the meaning of the Act.

## II.     Administrative Proceedings

On December 10, 1996, Parks applied for widow's insurance benefits on her deceased husband's account, DIB through the date she was last insured or December 31, 1995, and SSI, alleging disability since July 19, 1990, due to herniated discs in her lower back, high blood pressure, an eye problem, and a nervous disorder (Tr. 123-125, 126-128, 140).  Plaintiff later complained that she also suffered disabling right hip pain, carpal tunnel syndrome, and a mental disorder (Tr. 194).

After her applications were denied at the initial and reconsideration levels, Parks requested a hearing before an ALJ, which she received on May 2, 1998 (Tr. 29, 30, 31, 32, 33, 33A, 44-45, 56, 390-424).  The ALJ subsequently remanded Plaintiff's case back to the state agency for review of her alleged mental impairment, for which Parks indicated she had begun receiving treatment (Tr. 95-97).  Following a review of Parks' allegations of a mental disorder, the state agency denied Parks' claim,

and Parks again requested a hearing before an ALJ.  Parks received a supplemental hearing on November 2, 1999, and the ALJ issued a decision on December 3, 1999, denying her claims for benefits (Tr. 12-28).  Parks requested a review of the decision with the Appeals Council.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 404.970; 20 C.F.R. § 416.1470.  After considering Parks' contentions in light of the applicable regulations and evidence, on March 2, 2001, the Appeals Council concluded that there was no basis under the regulations for granting the request for review.

Parks then filed a civil action in the United States District Court.  Upon the Commissioner's request, the United States District Court, Southern District of Texas, remanded the case on March 5, 2002, to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g).  On June 13, 2002, the Appeals Council vacated the decision dated December 3, 1999, and remanded the case for further proceedings.  (Tr. 455-457).

Parks received a supplemental hearing on January 28, 2003, and the ALJ issued another unfavorable decision on February 27, 2003 (Tr. 493-545, 12-28).  Parks filed this timely appeal of the ALJ's decision.  Parks has filed a Motion for Summary Judgment (Document No. 13).  The Commissioner, in turn, has filed a Motion for Summary Judgment, a Memorandum in Support of Cross Motion for Summary Judgment in response, and a Reply to Plaintiff's Motion for Summary Judgment (Document Nos. 14, 16, 17).

### III.   Standard of Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Title 42, Section 405(g).  The Act specifically grants the district court the power to enter judgment upon the pleadings and transcript "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." *Id.*  While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d

4

1137 (5th Cir. 1973)).

## IV.   Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

A.   If the claimant is presently working, a finding of "not disabled" must be made;

B.   If the claimant does not have a "severe impairment" or combination of impairments, [she] will not be found disabled;

C.   If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

D.      If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

E.      If the claimant's impairment prevents [her] from doing any other substantial gainful activity, taking into consideration [her] age, education, past work experience and residual functional capacity, [she] will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Legget v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).   Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *Id.*  Once the Commissioner shows that other jobs are available, the burden again shifts to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Legget*, 67 F.3d at 564.

Here, the ALJ determined that Parks was not disabled at step four because she retained the ability to perform her past relevant work.   In particular, the ALJ determined that Parks was not presently working (step one); that her degenerative disc disease, hypertension, and carpal tunnel syndrome were "severe" but her depression was not (step two); that these conditions, when considered both singly and in combination, did not meet or equal an impairment listed in Appendix 1 of the regulations (step three); and that Parks' impairments did not preclude her from doing her past relevant work as a telephone operator (step four).

In this appeal, the Court must determine whether substantial evidence supports the finding in step four of the sequence that Parks' impairments do not prevent her from engaging in her past work as a telephone operator, and whether the ALJ used correct legal standards in arriving at that

6

conclusion.  In making this determination, the Court must consider whether the ALJ erred in finding that Parks' chronic pain and carpal tunnel syndrome rendered her unable to perform the work of a light duty telephone operator, and whether the ALJ erred in using the testimony of a vocational expert to conclude that Parks could perform her past relevant work.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.    Discussion

### A.    Objective Medical Evidence

The objective medical evidence of record documents that the claimant suffers from chronic pain due to degenerative disc disease, hypertension, and carpal tunnel syndrome.

Although the claimant alleged disability, in part, due to a mental disorder, the treating notes are generally silent with respect to symptoms and findings related to her mental status.  For instance, at Park's October 22, 1993, appointment with Dr. Robert Blair for her wrist pain, Dr. Blair wrote: "she denies feeling depressed or anxious, altho' she has that depressed look about her."  (Tr. 279-280).  In 1997, the medical records reveal that Parks was treated by Dr. Jeffrey Jones, a handful of times in the fall of 1997.  (Tr. 334-341).  Parks had her initial visit on October 30, 1997, and she had a follow up appointment on November 20, 1997.  The treatment notes are cursory and provide little information concerning Parks' treatment by Dr. Jones.

Because Parks had applied for benefits, she was referred for a consultative psychiatric

7

evaluation with Dr. Theron C. Bowers, Jr. (Tr. 344-348). That evaluation took place on February

3, 1999. *Id*. The results of Parks' mental status examination showed:

> Mental Status Examination: Her appearance–She is casually dressed, well groomed,
> wearing make-up, engagable, and cooperative with the interviewer. Her
> psychomotor activity is notable for restlessness. Her mood was dysphoric. Her affect
> was tearful. Thought processes were goal directed and logical. Thought content was
> negative for any delusions. She denies any suicidal ideations at the current time.
> Perceptions were negative for any hallucinations. On cognitive evaluation, she was
> awake, alert and fully oriented to person, time, and place. Her memory -remote
> memory appeared to be grossly intact as tested by knowledge of personal information
> such as date of birth and social security number. She could recall past Presidents
> Clinton, Bush, Reagan, and Ford. She knew the correct number of days in a year, but
> not weeks. Her recent memory as tested by drilled word test, she was able to recall
> four out of four items immediately, but no items after two minutes, and recognize all
> four items. She was re-drilled and after twenty minutes, she could recall all four
> items. This indicates that she has a slight problem with her incidental memory, but she
> is able to easily be cued. She is able to store and recall information over brief periods
> of time. Her attention and concentration were slightly impaired. She has some
> difficulty spelling "world" backwards, stating "dlow." Her abstractive capabilities as
> tested by similarities and differences–she reports that a cat and an elephant–one is
> small and one is big, an airplane and train–one flies and one is on a track, and an apple
> and orange–you can get juice from them. This indicates that she has a lot of difficulty
> with thinking abstractly. Her insight–she is aware of the purpose of the evaluation
> today. Her judgment as tested by hypothetical questioning appeared to be
> appropriate. (Tr. 345).

Based on his interview with Parks and her mental status examination, Dr. Bowers made the following

assessment and recommendation:

> This is a 54 year old female who reportedly has a history of some depression, but
> currently is not in treatment, now presenting for disability. She has significant medical
> and physical problems which include bilateral carpal tunnel syndrome and chronic
> back pain. Currently she is depressed on examination. (Tr. 346).

As to Parks' prognosis, Dr. Bowers wrote: "[w]ith current treatment at this time, prognosis is

guarded. Ms. Parks is currently not involved in any treatment and her symptoms appear to be quite

chronic. I do not think her symptoms will resolve on their own without treatment." (Tr. 346). The

medical records also show that a psychiatric review technique form was completed on April 7, 1999, by a DDS physician, who reviewed the pertinent mental health records.  (Tr. 349-357).  According to the evaluator, Parks had a major depressive disorder which had resulted in "slight" restrictions of activities of daily living, "slight" difficulties in maintaining social functioning, Parks "seldom" had deficiencies of concentration, persistence or pace, and never had an episode of deterioration.  (Tr. 356).

Finally, the records show that Parks, at the request of her disability counsel, was examined by a psychiatrist, Dr. Jamie Ganc on June 13, 2001.  (Tr. 485-489).  Parks reported to Dr. Ganc that she has "pain in both of my wrists and hands.  I also have severe problems in the lower back area, and I am depressed."  (Tr. 485).  As part of Parks' evaluation, she completed a questionnaire, and took several tests including the Beck Depression Inventory Scale, a sentence completion test, a house-tree drawing test, and MMPI-2.  As to Parks' mental status, Dr. Ganc wrote:

> Mental Status:  Ms. Parks is a 57-year-old female.  She is husky and well built, clean, alert and establishes a good rapport with the interviewer.  The patient is slow in her verbalization and thinking, and she has some concreteness.  Ms. Parks expresses a lot of concern about her physical condition and at times becomes suspicious about the reason of her illness and she is certain about the suspiciousness.  The patient has general paranoid ideations without specific target people or events.  She does state that she does not know why she is unable to get well and that maybe she is paying for some past misdeeds.  Ms. Parks denies hallucinations and homicidal or suicidal thoughts.  She was oriented x 3.  Her memory for past and present events was preserved.  Her affect was flat and her mood was depressed.  Her attention span was decreased; she retained 4 out of 5 objects.  Her intelligence was average.  Her insight and judgment for reality testing was preserved.  (Tr. 487).

The results of Parks' psychological testing revealed:

> Summary of Psychological Testing:  On the Beck Depression Inventory scale she scored 28, which puts her in a moderate to severe level of depression.  Her Sentence Completion test revealed an individual with limited insight.  She rationalizes about her condition and she is depressed, angry, and has a deep sense of loneliness,

9

hopelessness, and severe sleep disturbances.  The House-Tree-Drawing test revealed an individual who has primitive thinking with regression, a person who is isolated with suspiciousness and anger as well as fearfulness.  Her defenses are limited and functioning poorly.

MMPI-2:  There are high levels of depression and hysteria.  The profile was a valid one.  From an affective standpoint, individuals with this profile tend to be nervous, depressed, irritable and angry.  There is evidence of resentfulness and some hostility. From a personality/behavioral standpoint, these individuals tend to be dependent on others and angry for being dependent.  They tend to be demanding and dissatisfied with their lives and they expect a lot of others.  These individuals have a sense of being defeated and have a negative concept of themselves.  From an interpersonal standpoint, these individuals tend to prefer to be alone, and they have poor social adjustment.  They are resentful of demands and expect a lot of others.  From a cognitive standpoint, projection is the primary defense mechanism.  There is a lot of denial and intellectualization, and paranoiac features are evident.  Her defenses are working poorly and ineffectively and are not helping her to deal with her emotional problems.  From a somatic standpoint, these individuals tend to be quite concerned about their physical complaints; and there is evidence of tiredness, fatigue, weakness, and pain.  (Tr. 488).

Based upon the test results, and his interview of Parks, Dr. Ganc opined that Parks had "severe major depressive disorder with mild psychotic features."  (Tr. 488).  As to Parks' prognosis, Dr. Ganc wrote:

The prognosis in this case is guarded.  Ms. Parks suffers from severe physical problems that are multiple and handicapping.  She has not responded to any treatment.  I think this is a chronic problem that is going to get worse.  It affects her on a daily basis and has made her a handicapped person.  She has limited psychological resources as well as a poor support system.  (Tr. 489).

Dr. Nancy Tarrand, a psychiatrist,  testified at November 2, 1999, hearing.  Dr. Tarrand, based on her review of Parks' records, opined that Parks did not meet a listing including 12.04 because she had no symptoms of sleep disturbance, decreased energy and worthlessness, and  under "B" criteria had slight restrictions of daily living, slight difficulties with social functioning, seldom had difficulties of concentration, persistence or pace and had never had an episode of deterioration.  (Tr.

421).

Here, upon this record, the objective medical evidence factor does not weigh in favor of the ALJ's conclusion that Parks' depression was not a severe impairment.  Viewed as a whole, Parks has met the standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985) for a showing that her impairment is severe.  In *Stone*, the Fifth Circuit wrote that an "impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'"  *Stone*, 752 F.2d at 1101 (citation omitted).  With respect to an impairment such as depression, the Act looks to the "severity according to the functional limitations imposed by the mental impairment such as activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  *See* 20 C.F.R. p. 404, Subpt P, App. 1 § 12.00.  Here, all of the examining physicians, Dr. Jones, Dr. Bowers and Dr. Ganc, diagnosed Parks with a major depressive disorder.  Both Dr. Bowers and Dr. Ganc assigned to Park a GAF score of 40 and 43, respectively.  The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social and occupational functioning."  *Boyd v. Apfel*, 293 F.3d 698, 708 (5th Cir. 2001) (citing *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition (DSM-IV), at 32).  A GAF of 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends or unable to keep a job.") In addition, Parks' prognosis was characterized by Dr. Bowers and Dr. Ganc as being "guarded."  Moreover, both doctors identified areas in which Parks' limitations would significantly affect her ability to perform work-related functions. For instance, Dr. Bowers opined that Parks had a slight problem with her incidental memory and her attention and

concentration were slightly impaired.  Similarly, Dr. Ganc wrote that Parks was slow in her verbalization, she had general paranoid ideations, her affect was flat, her mood was depressed, and her attention span was decreased.  Here, there is no contrary medical evidence regarding Parks' depression.  Based on the medical evidence and Parks' testimony, Parks has made a threshold showing that her depression significantly limits her ability to do basic work activities.  On remand, the ALJ, pursuant to *Stone*, should assess the cumulative effect of Parks' non-exertional and exertional impairments have on her ability to work.  In addition, because the ALJ's RFC analysis did not take into consideration Parks' depression, his RFC assessment must be reconsidered.

With respect to Parks' other impairments, Parks' blood pressure was routinely taken at the Kelsey-Sebold doctor appointments.[1]  As to Parks' allegation relating to hypertension, the  medical

---

[1] Parks blood pressure was routinely taken at her doctor appointments.  Overall, the readings show her pressure was controlled through medication.  For instance, Parks had the following reading in 1991:  April 12, 144/90 (Tr. 312), April 16, 140/86, 138/90 (Tr. 311), April 22, 120/70 (Tr. 310), April 30, 148/90 (Tr. 308), May 2, 148/88, 152/86, 118, 80 (Tr. 308-309), and August 30, 140/80 (Tr. 306).  Readings taken in 1992:  January 21, 144/94 (Tr. 305, January 23, 124/80 (Tr. 304), January 29, 124/76 (Tr. 303), February 6, 122/84 (Tr. 302), August 12, 140/90 (Tr. 301, October 9, 150/100 (Tr. 300), November 25, 110/80 (Tr. 299), and December 10, 154/100 "borderline" (Tr. 297).  Similarly, readings taken in 1993 reveal:  February 2, 138/90 and 144/86 (Tr. 295, 296), May 10, 124/80 (Tr. 294), May 12, 112/80 (Tr. 293), June 23, 140/90 (Tr. 292), and July 29, 140/90 (Tr. 291).  Parks had the following readings in 1994:  January 26, 150/80 (Tr. 270), September 26, 140/90, October 19, 150/100, and October 27, 140/90 (Tr. 266).  In 1995, Parks had more blood pressure related problems.  On August 10, "HTN-likely source of fatigue 160/94 (Tr. 264), September 28, 150-100 "off meds" (Tr. 262), October 19, 160.106 "HTN uncontrolled" (Tr. 261), November 20, 154/98 (Tr. 260), and December 7, 168/100 "unable to take Norvasc" (Tr. 259).  Parks blood pressure stabilized in 1996:  January 16, 130.92 "doing well" (Tr. 258), January 25, 150/80 (Tr. 257), January 31, 133/88 (Tr. 256), February 21, 140/94 (Tr. 255), May 10, 150/100 (Tr. 253), July 31, 140/90 (Tr. 252), August 19, 120/84 (Tr. 252), October 7, 144/76 (Tr. 250), October 14, 160/96 (Tr. 249), November 14, 160/98 (Tr. 248), and December 2, 144/82 (Tr. 246).  In 1997, February 7, 138/94 (Tr. 237), April 23, 142/90, August 20, 130/90 (Tr. 231), and October 6, 160/108 (Tr. 230).  In 1998, February 25, 156/98 (Tr. 325), April 23, 140/100 (Tr. 326), April 30, 158/100 (Tr. 327), May 26, 140/90 "still borderline" (Tr. 328), August 6, 130/80 (Tr. 343), December 14, 140/100 (Tr. 384), and December 30, 150/94  (Tr. 382).  In 1999, April 8, 140/90 (Tr. 381, July 19, 140/99 (Tr.

records reveal that Parks' hypertension was characterized as "borderline" more often than not when Parks had run out of medication.  Overall, the records indicate that Parks' hypertension was well controlled. (Tr. 297, 262, 264, 261, 259, 258, 328, 382).   Hypertension is evaluated using section 4.03, Appendix 1, Subpart P, Regulations No. 4, which calls for further evaluation under sections 4.02 (congestive heart failure), 4.04 (ischemic heart disease), or under the criteria for the affected body system.  There is no evidence in this case of end organ damage due to hypertension.  Therefore, upon this record, the ALJ was correct in concluding that the claimant's impairment is not of listing level severity.

Parks was treated for eye problems in 1984, 1986, and 1988, (Tr. 316, 315, 314).  Parks also complained of pelvic pain and she underwent routine gynecological examinations. (Tr. 313, 311, 309, 308, 306, 296, 291, 266, 262, 257, 250, 237, 232-234).  Parks also sought treatment for stomach pain.  (Tr. 291, 270, 260).

The bulk of Parks' medical records show that she sought treatment for varicose leg pain, right hip pain, lower back pain and carpal tunnel pain at the Kelsey-Sebold Clinic in Houston, Texas.  For instance, in April 1991, Parks had appointments on April 12 and 22 for varicose vein pain.  (Tr. 310, 312).  On May 2, 1991, she underwent testing at the vascular lab.  The results of the tests were normal.  (Tr. 309).

On January 21, 23, and 29, 1992, Parks complained of left hip pain that radiated to her lower back.  (Tr. 303-305).  She was treated for a urinary tract infection.  *Id.*   On August 12, 1992, Parks sought treatment for hemorrhoids.  (Tr. 301).  On October 9, 1992, Parks was seen by Dr. Ernie Riffer, for her complaints of left wrist pain.  (Tr. 300).  Parks had a follow-up appointment with Dr.

_____

380), September 22, 140/100 "meds out?" (Tr. 368), and October 8, 170/102 (Tr. 367).

Riffer for her left wrist pain on December 10, 1992.  (Tr. 297).

The medical records from 1993 show that Parks was seen on February 2, 1993, for dizziness. (Tr. 295).  Parks had an appointment on May 10, 1993, where she was treated for pain in both wrists. (Tr. 294).  Parks returned on May 12, 1993, and was given trigger point injections in the left wrist. (Tr. 293).  Parks was seen again on June 23, 1993, still complaining of pain.  (Tr. 292).  Parks was seen by Dr. Brian Kaplan in the gastroenterology clinic on July 29, 1993, August 11, 1993, and August 25, 1993, where her symptoms were described as "asymptomatic."  (Tr. 291, 286, 278).

Parks had an orthopaedic examination on August 25, 1993.  (Tr. 277).  According to the treatment note, Parks' straight leg raise test on the left leg was positive at 90 degrees.  Based on this finding, Parks was referred for an MRI.  The MRI showed a "general bulging of the annulus fibrosus L4-5" and "herniation of the disc to the left side L5-S1.  Significant nerve root encroachment seen." (Tr. 273).  In addition, Parks had a lumbar spine evaluation by a physical therapist on September 21, 1993.  (Tr. 289-290).  Parks again had a positive left straight leg raising test.  The therapist, Lynne Davis, stated that Parks had left sciatica, gluteal myalgia and piriformis syndrome.  According to the therapist's note, the goal of the therapy sessions was to increase Parks' lumbar flexibility.  Parks attended twelve physical therapy sessions from September 21 through October 22, 1993.  (Tr. 272-276).  Parks had a follow up appointment on October 1.  Dr. Landon discussed the MRI results, namely that Parks had a disk herniation at the L5-S1 level on the left side that is consistent with sciatica.   According to the treatment note, Parks was "not enthusiastic about surgical decompression."  (Tr. 275).

On October 22, 1993, Parks had an appointment with Dr. Robert Blair for wrist pain.  (Tr. 279-280).  Parks reported that "PT for back is very helpful."  (*Id.*).  As for her wrists, Dr. Blair

14

reported that Parks had a full range of motion and good grip strength.  (*Id.*).

Parks had  follow up appointments with Dr. Landon for her back on November 22, 1993, and November 29, 1993.  (Tr. 271, 279).  Parks reported that her level of pain had increased with physical therapy.  The treatment note shows that Parks had a "slightly [positive] SLR, but good reflexes."  The notes further states that Parks was not interested in surgery.  (*Id.*).

Parks had two appointments on January 26, 1994, one for her stomach problems (Tr. 270), and the other with Dr. Landon.  Dr. Landon wrote:  "[patient] has continued back pain and left sciatica; no real overall [change]; [positive] [straight leg rising] test; strength [and] reflexes OK. She's not desirous of any [surgical] correction."  (Tr. 269).  Following Parks' February 7, 1994, visit with Dr. Landon, he wrote:  "returned to light duty–if available on 2-7-94."  (Tr. 269).  Parks had another appointment with Dr. Landon on March 8, 1994, which focused on her wrist.  (Tr. 269). Parks returned to Dr. Landon on April 7, 1994, at which time she complained of "generalized body pain."  (Tr. 269).  The treatment notes reflects that Parks had good gait, a negative straight leg raising test,  strength and reflexes were intact.  According to Dr. Landon's notation, "I told her we'll give her a short course of [physical therapy], but there's no objective justification for any prolonged disability."  (*Id.*).  At Parks' next appointment on September 26, 1994, she complained of lower back pain.  The note reveals that her back was tender and she was unable to flex on the left side.  (Tr. 268). Parks complained of abdominal pain and back pain when she visited the clinic on October 19, 1994. (Tr. 267).

The medical records from 1995 reveal that Parks had a March 20, 1995, appointment with Dr. Landon.  Dr. Landon wrote:  "she has back pain that's essentially the same as it was almost 2 years ago and some hip pain, occasionally down [left] leg.  Today's exam reveals a good gait,

negative SLR test, strength, sensation and reflexes intact." (Tr. 265). Similarly, Dr. Landon wrote on May 10, 1995: "no real evidence of any joint swelling; good gait, neuro intact." (Tr. 265). Parks had an appointment on October 19, 1995, for headaches and on November 20, 1995, she reported being "much improved." (Tr. 260, 261).

Parks had a routine dermatology appointment in January 1996. (Tr. 256). On May 10, 1996, Parks complained of left hip pain. (Tr. 253). She returned for a follow up on May 14, 1996. According to the treatment note, Parks had "no bowel or bladder disturbance. Gait is good. Negative straight leg raise sign, strength and reflexes were OK." (Tr. 243). Likewise, at Parks' October 14, 1996, office visit she complained of lower back pain. Parks' straight leg raising test was normal. (Tr. 249). On December 2, 1996, Parks complained of wrist pain. (Tr. 246). She was referred for a nerve conduction study, which she underwent on December 11, 1996. The test results were "consistent with bilateral carpal tunnel syndrome, right side more affected than the left side." (Tr. 242). Dr. Landon's treatment note from Parks' December 20, 1996, visit confirmed that Parks has "mild thenar atrophy and a right positive compression sign." (Tr. 241). Parks was next seen by Dr. Landon on January 31, 1997. (Tr. 238). Dr. Landon wrote: "carpal tunnel symptoms are much better. She has some aching in the arms but no numbness. Good strength today. Muscle bulk is good. Her back continues to bother her. Some left leg pain. Good gait. Negative straight leg raising sign. Strength is good except for mild dorsiflexion weakness on the left side." (*Id.*). Overall, Dr. Landon opined that Parks' carpal tunnel symptoms were resolving but her back remained problematic. (*Id.*)

A DDS physician completed a physical RFC on April 12, 1999. The physician, based on his review of Parks' medical records, opined that Parks' physical impairments were non severe and that

Parks could occasionally lift/carry up to 50 pounds, frequently lift/carry 25 pounds, could stand/walk up to 6 hours and was unlimited in her ability to push/pull.  As to postural limitations, the physician opined that Parks could occasionally climb, balance, stoop, kneel, crouch and crawl.  Parks had no manipulative, visual, communicative or environmental limitations.  (Tr. 358-365).

Parks sought treatment on April 8, 1999, for rectal pressure (Tr. 381), and on July 19, 1999, for left lower back pain and hip pain.  (Tr. 380).  Parks had a normal range of motion and gait, and was able to squat.  (*Id.*).  Parks was seen by Gary Rhame, D.O. on August 16, 1999, for an evaluation.  (Tr. 372-378).  Dr. Rhame wrote:

> Physical examination:  On examination today patient is a 55-year-old African American female, 5'4", 169 pounds.  Please see physical examination form.  Patient does not have previous surgeries from bunions bilaterally.  Range of motion of her cervical spine [is] normal in flexion without pain.  Extension, right lateral bending, left lateral bending, right and left rotation are all slightly decreased with pain in lateral bending and extension only.  Spurling maneuver is negative.  Strength testing of the biceps, triceps, shoulder abduction and wrist extension are normal.  There is no sensory loss, clonus or Babinski appreciated today.  Deep tendon reflexes are normal of C5, C6 and C7.  Vascular examination is normal.

> Radiographs:  Radiographs taken today of the cervical spine demonstrate degenerative anterior osteophyte specifically at C5 and C6.  There is some minimal disk space narrowing there.

> Final Diagnosis:  Chronic neck pain with radicular symptoms bilaterally.  (Tr. 372).

On August 27, 1999, Parks was seen by Dr. Aziz Shaibaini for carpal tunnel symptoms.  (Tr. 369-371).  Dr. Shaibani opined that Parks had "moderate severe bilateral carpal tunnel syndrome" and there was "no electrical evidence of diffuse neuropathy or cervical radiculopathy."  (*Id*).  Parks had follow up appointments on September 22, and October 8, 1998, at which she reported "doing fine."  (Tr. 367).

Here, upon the totality of the record, the objective medical evidence factor weighs in favor

of the ALJ's conclusion that Parks' impairments (degenerative disc disease, hypertension, and carpal tunnel syndrome) were severe impairments but that the impairments, individually or in combination, did not meet or equal a relevant listing.

Section 1.04, Appendix 1, Subpart P, Regulations No. 4, allows for a presumption of disability when there is evidence of a disorder of the spine or the spinal cord with: (A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test; or (B) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in section 1.00B2b. Based on the objective facts, the ALJ was correct in concluding that the claimant's impairment does not meet in severity the requirements of section 1.04 of the regulations (Tr. 443-44).

Similarly, Section 11.14, Appendix 1, Subpart P, Regulations No. 4, allows for a presumption of disability when there is evidence of peripheral neuropathies with significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. *Id*. Here, the medical records do not reveal that Parks' carpal tunnel syndrome met this listing.

### B.    Diagnosis and Expert Testimony

The second element considered is the diagnosis and expert opinions of treating and examining

physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight."  *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'"  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)).  Regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'"  *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

The Social Security Regulations provide a framework for the consideration of medical opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton*, 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490 (July 2, 1996).  With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "[a]djudicators must weight medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion." *Newton*, 209 F.2d at 456.

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.                    § 404.1527(d).  *Id.*  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhard*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, because the ALJ erred by finding that  Parks' depression was not a severe impairment,

and should do so on remand, this factor neither weighs in favor of or against the ALJ's decision.

### C.    Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook*, 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  42 U.S.C. § 423.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain.  *Id.*  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence in the record.  *Id.* Under the Social Security Act, pain is a disabling condition only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Sellers*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d. 33, 35 (5th Cir. 1994).  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant.  *Hames*, 707 F.2d at 166.

Parks testified as to many different causes of pain, which the ALJ properly evaluated.  At the first hearing held November 2, 1999, Parks testified that she was able to drive.  (Tr. 408).  Parks stated she lives with her son and that he helps her around the house.  (Tr. 409).  Parks denied being able to work in the yard or garden because of her bad back, leg, knee, and thigh.  (Tr. 413).  Parks

testified that she has problems getting to sleep because her "arms start aching like I'm in a freezer at night." (Tr. 413). Parks testified that she wears wrist braces at night, and during the day, if necessary. (Tr. 414). Parks also testified at the January 28, 2003, hearing. Parks stated that she drives daily to the grocery store but did not drive to the hearing, as she previously had. (Tr. 498). Parks stated that her medication makes her drowsy. (Tr. 500). According to Parks, she stays in bed two to three times a week. She spends her day watching television and sitting and does a little cooking. (Tr. 504). Parks denied being able to do ironing, laundry, sweeping, mopping and vacuuming. (Tr. 505). Parks estimated she could walk 100 feet. (Tr. 521). She did, however, estimate that she could stand 15 to 30 minutes, and could sit for 15 minutes. (Tr. 510). Parks states she is right handed and tends to drop things. (Tr. 511). Parks stated she was fired from her job with Metro because the medicine for her back spasms made her sleepy and she was sleeping on the job. (Tr. 513-514). According to Parks, she did not want surgery on either her back or wrist because the doctors could not guarantee a successful outcome. (Tr. 514-515). Parks stated that she has difficulty with buttons and writing. (Tr. 516). Parks described television as her companion and that she has lost interest in all activities. (Tr. 518-519). Based on the reasons which follow, the ALJ rejected Parks' allegations as not fully credible:

> The claimants activities of daily living, as summarized above, suggest that the claimant's symptoms are not as severe as alleged... The claimant's earnings record documents a good work history, a factor that indicates a motivation to work. However, a person's work history is one of many factors taken into consideration for a finding on credibility. Other factors include the objective medical evidence and opinion, clinical and laboratory findings, diagnostic tests, the extent of medical treatment and relief from medication and therapy, the claimant's daily activities, the extent, frequency, and duration of symptoms, attempts to seek relief from symptoms, and all of the evidence of record considered as a whole. The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as

found herein, and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated.  (Tr. 448).

Credibility determinations, such as that made by the ALJ in this case in connection with Parks' subjective complains of pain, are generally within the province of the ALJ to make.  *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (explaining that the ALJ has the discretion to evaluate the credibility of medical experts and lay witnesses and weigh their opinions accordingly).  Here, because the ALJ made and supported his credibility determination based in part on Parks' RFC, and given that the matter should be remanded for further development of the record, and becasue the credibility assessment is inextricably intertwined with the ALJ's assessment of Parks' RFC, which is not supported by substantial evidence, this factor neither weighs in favor of or against the ALJ's decision.

### D.      Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

Regarding Parks' past relevant work, the ALJ relied on a comprehensive hypothetical question to the vocational expert, Mr. Litt.  A hypothetical question is sufficient when it incorporates the impairments with the ALJ has recognized to be supported by the whole record.  Here, Parks described her past work as follows:[2]

---

[2] While Parks in her application stated that she used a typewriter as a telephone operator, she did not testify to this at the hearing.  (Tr. 164).

I would answer the telephone, give out bus schedule information, routing from one bus, the times and (inaudible) the person's going to take.  I had a huge, I had a big, a big huge book. I guess it weighed– I don't know how much and we had also a small key map that I needed.  Also, magnifying glass that runs on electricity that I would have to use to hold up to the map to see the street.  (Tr. 539).

The ALJ asked the vocational expert the following hypothetical question:

Q.  Okay.  All right, now, assume an individual of the age 46 to 58 years, who has a high school education and at least a basic ability to read, write and use numbers and who has experience as a telephone operator and who has a residual functional capacity to perform work at the sedentary level of exertion – I'm sorry– has the residual functional capacity to perform work at the light level of exertion, that is to lift 10 pounds frequently and 20 pounds occasionally, to stand for two hours at a time for a total of six hours in an eight-hour working day and to be seated for at least two hours at time, and with mild to moderate pain discomfort, and while performing at that level of exertion, would be precluded from any repetitive use of the hands with fine motor activity.  Could such an individual perform past relevant work?

A. Yes, sir.

           *                        *                     *

Q.  Sure.  We have an individual at the age of 46 to 58 years who has a high school education and at least the basic ability to read, write and use numbers.  And has experience as a telephone operator and who has the residual functional capacity to perform work at the light level of exertion.  That is to lift 10 pounds frequently and 20 pounds occasionally, able to stand two hours at a time for a total of six hours in a working day and to be seated for two hours in each eight-hour day.  And who is otherwise unlimited in that she can perform – she has no repetitive use of her hands for fine motor activity.  That was the question.  (Tr. 540).

Upon this record, it is unclear that Parks could perform her past relevant work as a telephone operator, given the discrepancies between Parks' application wherein she indicated that she used a typewriter in connection with her work, and her testimony, which did not indicate she used a typewriter.  Given that the matter should be remanded for further consideration, which may affect the ALJ's assessment of Parks' RFC, the ALJ should clarify the mental and physical demands of Parks' relevant work, including the type of equipment used by telephone operators, as Parks performed the

24

job and as the job is typically performed in the national economy, and the ALJ also should consider Parks' ability to perform her past relevant work, or any, work.

## VI.    Conclusion and Order

Considering the record as a whole, it is the opinion of this Court that further consideration of the record is necessary because substantial evidence does not support the ALJ's finding that Parks' depression was not a severe impairment and because substantial evidence does not support the ALJ's finding that Parks could perform her past relevant work, and based on these infirmities in the ALJ's opinion, substantial evidence does not support the ALJ's decision.  As such, the Court ORDERS that Defendant's Motion for Summary Judgment (Document No. 14) is DENIED, Plaintiff's Motion for Summary Judgment (No. 13), is GRANTED and the case is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 19th day of December, 2007.

Frances H. Stacy
United States Magistrate Judge

25